SCHOTT, Chief Judge.
This is a suit by the State of Louisiana against the father of J.B., a girl born on January 25, 1981, to terminate his parental rights pursuant to LSA-R.S. 13:1601(B). The trial court denied the petition and ordered the state to develop a plan to reunite the father and child and to submit the plan to the court within ninety days. The state has appealed.
Pursuant to R.S. 13:1601(B) the state may petition for termination of parental rights of the parent of an abused or neglected child, or one in need of care when the following grounds are alleged:
B. (1) One year has passed since the rendition of an abuse or neglect judgment or child in need of care judgment, as defined in R.S. 13:1600(7), pursuant to the Code of Juvenile Procedure, and in the opinion of the court the parent is unfit to rear the child.
(2) The parent or parents have shown no significant substantial indication of reformation and are unlikely to reform.
In order to support a judgment the state must prove its allegations by clear and convincing evidence. R.S. 13:1603(A).
The trial judge in reasons for judgment found that the state failed to carry its burden of proof that the father was unfit or that he had shown no significant substantial indication of reform. The issue in this court is essentially factual as to whether the trial court erred in discounting the weight of the state’s evidence.
The first element of proof, that one year had passed since the date of the child in need of care judgment, is not disputed. J.B. was adjudicated a child in need of care in another section of the Juvenile Court on July 9, 1986. However, these early proceedings and the facts leading up to them are closely related to and part of the issues now being considered.
In April, 1985 J.B.’s father brought her to Mrs. Diane Broughton to keep her while he was at work as a truck driver. The mother had just abandoned them. Mrs. Broughton cared for the child all the time except for occasions when the father took her away for four hour visits. After such a visit in October, 1985 she realized something was wrong with the child and took *149 her to her physician on October 26. Finding J.B.’s hymen not intact and a vaginal discharge, he thought she had been sexually abused. He reported the case to the Orleans Parish Child Protection Agency. On November 9 Mrs. Broughton brought the child to Charity Hospital for a second opinion, but, this time, the physician found no evidence of sexual abuse. Because of these conflicting findings the Child Protection Agency referred the child to Dr. Rebecca Russell a pediatrician specializing in cases of child sexual abuse, for another examination.
On April 8, 1986, Dr. Russell examined the child. She explained to J.B. that she was a special doctor who saw children with problems for “bad touching”. With the aid of an anatomical drawing the child stated that her father had touched her in the vaginal area which she called her “private parts”, this happened “A lot of time” and he also gave her “bad kisses”. After a genital examination on the child Dr. Russell concluded that she was a victim of sexual abuse. A summary of the evidence considered by the Juvenile Court judge in the child in need of care proceedings includes the above in addition to a statement by Mrs. Broughton that she witnessed the father tongue kissing and fondling the child and a statement by the child’s therapist that she told her the father had placed his finger in her vagina many times.
In the 1986 judgment the court continued the child in the custody of the Office of Human Development (OHD) and placement with Mrs. Broughton; authorized supervised visits between the father and child; ordered continued therapy for the child; and recommended therapy for the father. At this point the mother of the child was a party to the proceedings and the court ordered OHD to assist her in the hope that she could eventually assume custody.
On June 14, 1990 the stated filed the current proceedings to terminate the father’s parental rights, and on January 15, 1991 the matter came to trial. By this time the mother’s parental rights had been terminated because she had abandoned the child.
Glynn Wade of the Office of Community Services provided this testimony: She referred J.B.’s father to a sex abuse perpetrator group for therapy in 1988, but he went only sporadically, the last time in June, 1990. He called her the next day to say he would not go back because they expected him to admit molesting the child which he denied. Her agency considered J.B.’s case as appropriate for adoption so that termination of parental rights was necessary.
Linda Johnson, an attorney, testified: She was employed by the Orleans Indigent Defender Program when the child in need of care proceedings took place and was appointed to represent J.B. Asked whether there had been an adjudication she stated that all counsel, including the father’s reviewed Dr. Russell’s report and stipulated that the child was in need of care in the custody of OHD. The stipulation was as to all the allegations of the petition.
Nikki Alexander testified: She is a social worker who specializes in the field of sexually abused children. J.B. was referred to her by the Office of Community Services. She saw her regularly between January 27, 1986 and September, 1989 and for the last time in January, 1990. During this period the child was also being seen by a psychiatrist who diagnosed post traumatic stress syndrome in the child from sexual abuse. At all times the child consistently described the sexual abuse and identified the father as the perpetrator. Alexander met the father only once, on the occasion of a joint therapy session conducted by Susan Fer-ron, a social worker assigned to the father’s case. On this occasion the father offered the child money in exchange for a kiss which Alexander thought was inappropriate. The child frequently told Alexander she didn’t want to see her father or live with him any more. Alexander did not think it was in the child’s best interest to begin a reunification process with the father.
Susan Ferron testified as follows: She is a social worker who specializes in sex abuse cases including the treatment of offenders. J.B.’s father was referred to her *150 by the Office of Community Services. She saw him from September, 1986 until June, 1987. He denied that he abused the child and she thought during her first eight sessions with him that he was innocent. He showed great concern for the child, he was able to describe in detail the child’s allegations against him, and he showed no anger toward the child. All of these are unusual for a child abuser. In February or March, 1987 she had the father and child come to a joint session with her and she thought their relationship was unusual. The child kept her distance from him and he offered her money for a kiss. He told her he would find another little girl to take home if she didn’t kiss him. Ferron testified this conduct was inappropriate and thought the interaction between them was “strange”, any affection was “strained” and their attitudes were “artificial”. This caused Fer-ron to become suspicious. She next interviewed the child alone and she clearly, consistently, and repeatedly described the father’s sexual abuse of her with the assistance of an anatomical doll. She refused to discuss it in his presence. At this point Ferron no longer believed the father’s protestations of innocence. She thought the father’s rehabilitation was contingent on his admission of guilt. Since he refused to do this she thought it was in the child’s best interest to free her for adoption. Asked whether she thought someone was putting the child up to these accusations Ferron stated:
“She didn’t waiver. I was looking at this six year old child and she didn’t waiver or miss a beat in describing what happened. She showed a lot of emotion while she described the allegations, so I had no doubt.”
The father testified unequivocally that he never molested his child and he accused her mother and Mrs. Broughton of putting these ideas in her head.
In his reasons for judgment the trial judge held that the state failed to prove its case by clear and convincing evidence. He dismissed the testimony of Susan Ferron regarding her perception that the interaction between the child and her father was unusual. He considered it as simply a “negative reaction” without significant evi-dentiary assistance to the state’s case.
In order to prevail the state had the burden of proving by clear and convincing evidence that 1) one year had passed since the child had been adjudicated in need of care; 2) the parent was unfit to rear the child; and 3) the parent had shown no significant substantial indication of reformation and was unlikely to reform. There is no dispute with respect to the first element. As to the second, a parent who sexually abuses his child is unfit to rear the child. R.S. 13:1600(6). Thus, the overriding issue is whether the state proved by clear and convincing evidence that the J.B.’s father abused her sexually. If the state’s evidence was sufficient on this issue, the third element was likewise established because the evidence was without contradiction that unless the father would admit that he perpetrated these abuses therapy would be fruitless.
We have concluded that the trial court committed manifest error in concluding that the state failed to prove the charge against the father. First, Dr. Russell’s examination of the child was conclusive that some sexual abuse had occurred. Second, this child was five years old when she was examined by Dr. Russell and told her without equivocation that her father had abused her. This charge remained consistent through the period of time she was being treated by Nikki Alexander from January, 1986 until January, 1990 and was consistent with what the child told Susan Ferron in 1987. At no time did the child suggest that anyone other than the father had molested her. Third, these professional witnesses, Alexander and Ferron, were specifically recognized by the trial judge for their expertise in his reasons for judgment, and they were convinced that the father had abused the child. Fourth, Fer-ron, who was experienced and well qualified in the field of child abuse, became convinced after seeing the father and child together that he was guilty of molesting her even though she thought before these observations that he had not done it. The trial judge could evaluate this meeting only *151 on the basis of how Ferron described it to him. A second hand description of such an incident would not be the equivalent of the expert’s first hand observation. Consequently, the trial court erred by failing to give adequate weight to the expert opinion of Susan Ferron. Fifth and most important of all, the father failed to offer any explanation whatsoever as to how his child became abused in the face of the evidence that he was the perpetrator. The evidence was uncontradicted that this five year old child had been abused when she was living with her family consisting of a half brother and her parents. The father testified that the child had stuck a pencil into her genital area while being bathed with her brother, but Dr. Russell’s testimony establishes much more than a single isolated incident of abuse. The father did not suggest that the brother or the mother abused the child sexually so the question remained as to how or by whom did it happen. His failure to provide any plausible explanation for the fact that the child was abused while in his care leads to the inescapable conclusion that he did it.
Accordingly, the judgment appealed from is reversed and set aside. There is judgment in favor of the state and against J.B.’s father terminating his parental rights. The case is remanded to the trial court in order that the appropriate documentation may be produced to give effect to this judgment.
REVERSED AND RENDERED.